## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

Mohamed John Sohel Akhtar and La Buca Restaurant, Inc. d/b/a Swing 46 Jazz and Supper Club,
  Plaintiffs,

v.

Eric M. Eisenberg, and John and Jane Does One through Thirty,
 Defendants.

Case No. 23-cv-06585 (JGLC)(VF)

**Plaintiffs' Response In Opposition To Defendant Eric M.**

**Eisenberg's  Motion To Dismiss Plaintiffs' Amended Complaint**

**Anthony N. Iannarelli Jr.**
**74 Lafayette Avenue**
**Suite 202 # 116**
**Suffern, New York 10901**
**212-431-1031**
anilaw2@gmail.com

**Attorney for Plaintiffs**

1

## Table of Contents

Table of Contents------------------------------------------------------------------2
Table of Authorities ---------------------------------------------------------3
Preliminary statement -----------------------------------------------------4
1. Ripeness Does Not Bar Civil Rights Claims-----------------------------6
2. Jurisdiction Over Defendant Eisenberg Is Proper----------------------6

3. Legal Standard for Civil Rights Claims Is Met--------------------------8
4. Judicial Notice of OATH Decisions Does Not Preclude Claims---10
5. Subsequent Conduct Revives Barred Claims--------------------------10
6. Allegations of Racial Bias Are Well-Pled and Substantiated-------12
7. Fraudulent Conduct Is Well-Pled Based on Specific, Repeated
   Misrepresentations-----------------------------------------------------12
8. Anti-SLAPP Law Does Not Bar Federal Civil Rights Claims-------14
9. Joinder of Necessary Parties Is Not Required------------------------14

10. Default in Administrative Proceeding Does Not Constitute
Admission--------------------------------------------------------------------15

## Table of Authorities

### Cases

Ashcroft v. Iqbal, 556 U.S. 662 (2009)--------------------------------------------------12
Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007)----------------------------------14
Patsy v. Board of Regents of State of Florida, 457 U.S. 496 (1982)----------6
Provident Tradesmens Bank & Trust Co. v. Patterson, 390 U.S. 102
(1968)-------------------------------------------------------------------------------------------15
West v. Atkins, 487 U.S. 42 (1988)-----------------------------------------------------9
Brown v. City of Oneonta, 221 F.3d 329 (2d Cir. 2000)------------------------12
Carroll v. Trump, 49 F.4th 752 (2d Cir. 2022)-----------------------------------14
Global Network Commc'ns, Inc. v. City of New York, 458 F.3d 150 (2d  Cir.
2006)-------------------------------------------------------------------------------------------10
Leather v. Ten Eyck, 180 F.3d 420 (2d Cir. 1999)--------------------------------15
TechnoMarine SA v. Giftports, Inc., 758 F.3d 493 (2d Cir. 2014)------------11
Sulzer Mixpac AG v. Medenstar Indus. Co., 312 F.R.D. 329 (S.D.N.Y.
2015), aff'd, 754 F. App'x 101 (2d Cir. 2018)-------------------------------------7

### Statutes

**42 U.S.C. § 1981**---------------------------------------------- **6, 11, 14, 16**
**42 U.S.C. § 1982**----------------------------------------------**6, 9, 11, 16**
**42 U.S.C. § 1983**----------------------------------------------**6, 8, 9, 11, 14, 15, 16**

### Rules

**Federal Rule of Civil Procedure 4(f)(3)**-------------------------------------**7**
**Federal Rule of Civil Procedure 8(a)**----------------------------------------**13**
**Federal Rule of Civil Procedure 9(b)**---------------------------------------**13**

<u>Plaintiffs' Preliminary Statement</u>

This is plaintiff's Mohamed John Akhtar and La Buca Restaurant, Inc.,

dba Swing 46 Jazz and Dinner Club, hereinafter "plaintiffs," Response in

Opposition to defendant Eric M. Eisenberg's, hereinafter "defendant

Eisenberg," Motion to Dismiss plaintiffs' Amended Complaint

Defendant Eisenberg attempts to paint this lawsuit as an unfounded

attack on his rights, when plaintiffs' complaint is a well-pled civil rights

action supported by evidence of harassment, fraud, and racial

discrimination, among other offenses. In his application, defendant

Eisenberg ignores controlling precedent from the United States Supreme

Court and United States Court of Appeals for the Second Circuit.

In response to defendant Eric M. Eisenberg's Motion to Dismiss,

plaintiffs make a concise legal argument below as to why that motion

should be denied as a matter of law. However, in defendant Eisenberg's

Motion he mixes facts with law, but those allegations are clearly rebutted by

plaintiffs.

Among other items, plaintiffs were able to locate, without the benefit

of discovery, a second document to refute that defendant Eisenberg only

filed one complaint Exhibit A. In it defendant Eisenberg is listed as the

4

"Enforcement Agency," a clear admission he was acting under "color of law" for the purposes of civil rights litigation.

Defendant Eisenberg ignores the fact that he collected data in an unorthodox manner by placing a cell phone to speakers while trespassing upon plaintiffs' property. See Declarations of Mohamed John S. Atkar and Michelle Collier, attached as Exhibits B & C, respectively.

Plaintiffs have retained a professional sound engineer, Howard Fredrics that gives professional context to what the witnesses observed Exhibit D. "…alternatively, Mr. Eisenberg had a nefarious intent to distort the results of his measurements for the purpose of making his noise complaints appear genuine, when they are not." *id*. at ¶ 11.

What has also been apparent is defendant Eisenberg has sought to deny plaintiffs their right to counsel in their opposition to his relentless and discriminatory behaviors. Filing frivolous motions to get counsel thrown off a case is one thing, but it is quite another to engage in attempts at intimidation. See also, D.I. # 175 "You continue to be a liar, and I will ensure you are brought to justice." Defendant Eisenberg email to counsel, dated March 27, 2025.

Among his many threats, Defendant Eisenberg broke new ground with this one. He is an attorney, and he knows a judge is not going to

sanction an attorney for representing a client in difficult circumstances. He makes this statement in a civil rights case, where there has been an ugly history of attempts at visiting harm against litigants. It is not clear what extrajudicial punishment he has in mind, but it is an actionable offense in his attempt at depriving plaintiffs of their right to counsel.

1. Ripeness Does Not Bar Civil Rights Claims

This case is ripe for judicial review because it concerns federal civil rights violations, which are not subject to exhaustion of administrative remedies. The doctrine of exhaustion does not apply to claims brought under 42 U.S.C. § 1981, 1982, or 1983. Plaintiffs are not required to pursue state administrative relief before asserting their federally protected rights in federal court. See Patsy v. Board of Regents of State of Florida, 457 U.S. 496, 102 S. Ct. 2557, 73 L.Ed.2d 172 (1982).

2. Jurisdiction Over Defendant Eisenberg Is Proper

Defendant Eisenberg, an attorney-at-law of New York, has gone to great lengths to avoid service of process of plaintiffs' summons and amended complaint. The court has already ruled that alternative service by email upon defendant Eisenberg was valid and effective. As such, the

argument raised in the motion to dismiss concerning personal jurisdiction due to insufficient service is moot.

Service via email has been previously authorized within the United States District Court for the Southern District of New York, under appropriate circumstances, where traditional service proved impracticable. See Sulzer Mixpac AG v. Medenstar Indus. Co., 312 F.R.D. 329, 332–34 (S.D.N.Y. 2015), aff'd, 754 F. App'x 101 (2d Cir. 2018) (upholding email service under Rule 4(f)(3) as constitutionally sufficient when reasonably calculated to apprise defendant of the action).

As for jurisdiction within the U.S. District Court for the Southern District of New York, defendant Eisenberg also makes numerous admissions throughout his many pleadings placing himself within the district. He places himself at the Swing 46 location numerous times after the July 2023 filing of the initial complaint. *"For purposes of this letter motion, I will highlight two of the multiple incidences…."*    See DI # 162 at p. 1 ¶ 3.

Among his "multiple incidences" he lists two specific dates: September 12 and October 9, 2023. id. at pp. 1-2. These dates occur well after the occurrences of the allegations in plaintiffs' initial complaint, and

constitute new causes of action for civil rights violations within plaintiffs'
Amended Complaint.

It is also noteworthy that defendant Eisenberg would like to convey
the impression that he is safely ensconced in the State of Florida, and
outside the jurisdiction of this Court.  Again by his own statements he
places himself within the jurisdiction of the Court. See  D.I. # 132,  Exhibit D
"….your client continues to blast music outdoors…"  Defendant Eisenberg
email, dated February 11, 2025, placing himself within hearing distance of
Swing 46.

3. Legal Standard for Civil Rights Claims Is Met

To state a claim under 42 U.S.C. § 1983, a plaintiff must show that
the defendant acted under color of state law and that the conduct deprived
the plaintiff of rights secured by the United States Constitution or federal
law. Eisenberg, while not a government employee, operates under a
municipal framework where he is an agent or servant of the New York City
Municipal government. As such he earned a percentage of fines levied
through enforcement actions. This financial incentive for issuing citations
on behalf of the City of New York places his actions under the color of law.
His conduct—fabricating violations, trespassing, and harassing plaintiffs—
represents a deprivation of constitutional rights, including due process and

equal protection. See <u>West v. Atkins</u>, 487 U.S. 42, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988)

In addition to violating 42 U.S.C. § 1983, defendant Eisenberg's conduct also violates 42 U.S.C. § 1982, which protects the rights of all citizens to inherit, purchase, lease, sell, hold, and convey real and personal property without racial discrimination. Plaintiffs have alleged that Eisenberg's actions—namely, repeated trespass onto their business property, fabrication of municipal violations, and ongoing interference with the operation of their restaurant—were racially motivated and intended to disrupt their ability to hold and use their commercial premises. This constitutes a direct violation of § 1982, which courts have long interpreted to include not only access to property but the ability to maintain and operate it free from racially discriminatory interference. These allegations are supported by sworn witness accounts and a clear pattern of conduct that persisted despite verbal warnings and the filing of this lawsuit. The complaint thus satisfies the pleading standard for § 1982, as it asserts intentional racial discrimination resulting in a tangible impairment of plaintiffs' property rights.

4. <u>Judicial Notice of OATH Decisions Does Not Preclude Claims</u>

Defendant Eisenberg claims the Court takes judicial notice of prior administrative findings, but plaintiffs contend these findings were the result of fraudulent and deceptive conduct. Because the validity of those findings is contested, they are not appropriate for judicial notice at this stage. The administrative record should be subject to evidentiary scrutiny in the normal course of discovery and trial. See <u>Global Network Commc'ns, Inc. v. City of New York,</u> 458 F.3d 150 (2d Cir. 2006).

In any case, the conduct of how OATH operated is currently before the United States Court of Appeals.

5.<u>Subsequent Conduct Revives Barred Claims</u>

Although the court dismissed certain claims with prejudice in the prior complaint, Eisenberg's new and ongoing misconduct—including repeated trespass, harassment, and interference with plaintiffs' business— constitutes a distinct course of conduct that is separately actionable. These incidents are not merely continuations of previously litigated claims but represent new violations occurring after the court's prior ruling. Specifically, Eisenberg returned to plaintiffs' restaurant on multiple occasions, harassed staff, and created a threatening environment despite prior warnings. Most

significantly, defendant Eisenberg engaged in this misconduct during the pendency of this very litigation which was designed with the intent of restraining him from acting unlawfully.

In addition to his conduct at the business premises, Eisenberg also attempted to obstruct and undermine the judicial process. He evaded and obstructed service of process, made false representations to the court regarding his residency, and attempted to deny plaintiffs of legal counsel. These actions were not isolated missteps but part of a broader pattern of retaliation against plaintiffs for asserting their civil rights. Such behavior supports claims under 42 U.S.C. § 1983 for retaliation and denial of access to the courts, and also underscores the discriminatory and malicious intent behind his conduct—further supporting plaintiffs' claims under § 1981 and 1982.

This pattern of post-dismissal retaliation revives the viability of emotional distress and civil rights claims. It reflects a deliberate intent to punish plaintiffs for pursuing legal recourse and to intimidate them into silence. See TechnoMarine SA v. Giftports, Inc., 758 F.3d 493 (2d Cir. 2014) (new conduct post-dismissal may give rise to new claims). Plaintiffs' allegations are supported by witness testimony and procedural records and must be allowed to proceed to discovery.

6.Allegations of Racial Bias Are Well-Pled and Substantiated

Plaintiffs allege that Eisenberg's enforcement activities targeted them due to their race and ethnicity. This is supported by multiple independent witness statements. These allegations of discriminatory animus go beyond mere speculation and raise legitimate issues of fact, satisfying pleading requirements and entitling plaintiffs to proceed to discovery. See Ashcroft v. Iqbal, 556 U.S. 662 (2009); Brown v. City of Oneonta, 221 F.3d 329 (2d Cir. 2000)

7.Fraudulent Conduct Is Well-Pled Based on Specific, Repeated Misrepresentations

Plaintiffs allege that defendant Eisenberg engaged in a calculated pattern of fraudulent conduct designed to fabricate evidence of municipal code violations. Multiple witnesses will testify that Eisenberg repeatedly trespassed onto plaintiffs' property to gather photographic and audio "evidence" used to initiate enforcement proceedings. Despite being warned to stay away, Eisenberg continued to return—persisting even after this lawsuit was filed—which supports the inference that his conduct was not merely mistaken, but intentionally abusive.

The fraud stems not only from how Eisenberg obtained the evidence but how he used it. He submitted this evidence to municipal authorities while implying it was lawfully and objectively gathered, knowing this would result in official enforcement actions and generate personal financial gain through bounty payments. That is a clear misrepresentation of material fact.

This conduct satisfies Rule 9(b)'s heightened pleading standard. Plaintiffs identify:

- Who committed the fraud: Defendant Eisenberg;

- What was fraudulent: submission of illegally obtained or staged evidence as legitimate proof of violations. This is in addition to the defiant trespass, harassment, and stalking.

- When and where it occurred: on multiple documented occasions, at plaintiffs' place of business, at 349 West 46 Street, New York, New York, both before and after this lawsuit was filed;

- How it was fraudulent: by misleading authorities into believing violations occurred under lawful observation.

To the extent the defendant suggests the entire complaint must meet Rule 9(b), that argument misstates the law. Only the fraud claim must meet that standard. The remaining civil rights claims are governed by Rule 8(a) and require only a short and plain statement showing entitlement to relief.

See <u>Bell Atl. Corp. v. Twombly,</u> 550 U.S. 544 (2007). Plaintiffs easily meet

that threshold by alleging a sustained campaign of racial harassment,

abuse of authority, and retaliation. Taken together, these facts present a

credible and well-pleaded claim of fraud, which should not be dismissed

prior to discovery.

### 8. Anti-SLAPP Law Does Not Bar Federal Civil Rights Claims

The anti-SLAPP statute does not shield defendants from

accountability for unlawful conduct under federal civil rights statutes.

Plaintiffs are not challenging legitimate petitioning activity, but rather

asserting that Eisenberg misused governmental enforcement authority to

retaliate, discriminate, and harass. Anti-SLAPP laws do not override federal

protections afforded under § 1983 or § 1981. federal courts have held that

anti-SLAPP cannot be used to bar constitutional claims. See Carroll v.

Trump, 49 F.4th 752 (2d Cir. 2022).

### 9. Joinder of Necessary Parties Is Not Required

Defendants claim that plaintiffs failed to join an indispensable party,

yet do not name any specific entity whose absence precludes just

adjudication. Plaintiffs assert that all essential parties are already joined.

Furthermore, Eisenberg inaccurately claims he issued only one citation.

Plaintiffs have documented at least two: Summons Nos. 0216 401 177 and

0216 392 386.  Since discovery has not yet begun, there may be more.

This misrepresentation underscores the need for factual investigation

and reinforces that dismissal at this stage would be premature. See

Provident Tradesmens Bank & Trust Co. v. Patterson, 390 U.S. 102 (1968).


10. Default in Administrative Proceeding Does Not Constitute Admission

Defendants assert that because plaintiffs defaulted in the underlying

administrative proceeding, they are deemed to have admitted the offense.

This is incorrect as a matter of law. A default in an administrative hearing is

not an adjudication on the merits and does not preclude a plaintiff from later

asserting civil rights violations in federal court. The Second Circuit has held

that defaults may result in administrative liability, but do not automatically

constitute admissions in a broader legal or constitutional sense. Plaintiffs'

default may reflect procedural circumstances—not an admission of guilt or

legitimacy of the enforcement. The constitutionality and motivations behind

the enforcement actions remain proper subjects of federal judicial inquiry.

See Leather v. Ten Eyck, 180 F.3d 420 (2d Cir. 1999) – A §1983 plaintiff's

claims were not barred by an earlier state proceeding because the relief

sought (damages for constitutional violations) was not available in the prior

action.

## Conclusion

Defendant Eisenberg's Motion to dismiss is an attempt to avoid discovery and silence a legitimate civil rights complaint. In the face of serious allegations of racial discrimination, fraudulent conduct, and harassment, defendant Eisenberg relies on a distorted reading of the law and outright misstatements of fact. He incorrectly claims that a procedural default equates to an admission of guilt, that federal civil rights claims must be exhausted administratively, and that he issued only a single citation—despite clear evidence to the contrary.

Controlling Supreme Court and Second Circuit case law reject these arguments. Civil rights claims under § 1981, 1982, and 1983 do not require exhaustion, administrative defaults do not preclude constitutional claims, and the validity of service has already been affirmed by this court. Eisenberg's invocation of the anti-SLAPP statute is likewise inapplicable to federal claims. The factual disputes presented herein are precisely the type that should be resolved by a jury. Plaintiffs respectfully request that the court deny the motion in its entirety and allow this case to proceed to discovery and trial.

Dated:  April 25, 2025

Anthony N. Iannarelli Jr.
Attorney for Plaintiffs

16

<u>Affirmation of Word Count</u>

I affirm the word count contained in Plaintiffs' Response in Opposition to defendant's Motion to Dismiss Amended Complaint, exclusive of Exhibits, totaled 2,872 words.

The basis for my belief is upon a computer generated word county.

I affirm to the truth of the above and I am aware that I can be subject to punishment for any statement knowingly made false.

Dated: April 25, 2025

Anthony N. Iannarelli Jr.

Attorney for Plainitffs

Exhibit A

# NYCServ Violation Copy
Internet



0216401177

---

**0215000005005003**

SUMMONS • FOR CIVIL PENALTIES ONLY

## SUMMONS NUMBER: 0216 401 177

ENFORCEMENT AGENCY: ERIC EISENBERG

AGENCY CONTACT INFORMATION: ERICNOISE@-DIVISION-.HOTMAIL.COM

LAST NAME OR COMPANY NAME (Print) SWING 46          FIRST NAME

CELL PHONE #:

STREET ADDRESS   349 W 46TH ST                    APT. NO.

CITY   NEW YORK                STATE   NY          ZIP  10086

ID NUMBER:

TYPE OF ID/ISSUED BY:

DATE OF OCCURRENCE: 09 / 17 / 22    TIME OF OCCURRENCE: 6:47PM

PLACE OF OCCURRENCE: 349 W 46TH ST

BOROUGH OF OCCURRENCE: MANHATTAN          CB No.

☐ Alternative Service

You must respond to the Summons. You can appear on the hearing date and the location below or choose another option. For other options on how to respond, see the back of this page.

HEARING DATE: 09 / 13 / 23  AT: 9:00AM

OFFICE OF ADMINISTRATIVE TRIALS AND HEARINGS
See reverse side for address

[borough]

Phone: (844)628-4692

FOR HEARING OPTIONS, SEE THE BACK OF THIS PAGE
REFER TO THE SUMMONS NUMBER ABOVE ON ALL CORRESPONDENCE

WARNING: If you do not respond, you may be found automatically responsible and you may owe larger penalties. If you do not pay any imposed penalties, you may lose your ability to keep or get a City license, permit or registration. The City might also take further legal action against you. See the back for more information.

| Details of Violation(s) | | | | |
|---|---|---|---|---|
| Section/Rule NYC AD. CODE 24-244(B) | OATH Code | AN | 9 | 5 |

Mail-In Penalty: $ 440        Maximum Penalty: $ 1750

☐ Respondent must appear in person   I OBSERVED RESPONDENT PLAYING SOUND FROM SPEAKER OR SPEAKERS, IN AWNING, OUTSIDE OF BUSINESS FOR COMMERCIAL/BUSINESS ADVERTISING PURPOSES (AUDIBLE ON SIDEWALK)

☐ Property Removed   ☐ 1-2 Family   ☐ Multiple Dwelling   ☐ Commercial

NYC Charter Sections 1048 and 1049-a and the Rules of the City of New York authorize the NYC Office of Administrative Trials and Hearings (OATH) to hold hearings.

I, _____, affirm under penalty of perjury that I personally observed the commission of the violation(s) charged above _____. False statements made herein are punishable as a Class A Misdemeanor pursuant to section 210.45 of the Penal Law.

RANK (TITLE) SIGNATURE OF COMPLAINANT          REPORT LEVEL (PD 4 spaces) Comm'r, Stat. Unit, etc.

COMPLAINANT ERIC EISENBERG

TAX REGISTRY NUMBER   AGENCY  999

LAST NAME EISENBERG          FIRST NAME  ERIC

STREET ADDRESS  PO BOX 2452

CITY  NEW YORK          STATE  NY          ZIP  10108

0216 401 177

Exhibit B

# UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF NEW YORK

Mohamed John Sohel Akhtar and
La Buca Restaurant, Inc. d/b/a
Swing 46 Jazz and Supper Club,

      Plaintiffs,

        v.

Eric Adams, Mayor of the City of
New York, Rohit T. Aggarwala, New
York City Department of
Environmental Protection, Eric I.
Eisenberg, and John and Jane
Does One through Thirty,

      Defendants.

Case No. 23-cv-06585 (JGLC)(VF)

### Declaration of Mohammed John Sohel Aktar

I, Mohammed John Sohel Aktar, of full age, declare and affirms, under the penalty of perjury, to the truth of the following:

1. I am a resident of the City of New York and owner/operator of La Buca Restaurant, Inc., d/b/a Swing 46 Jazz and Supper Club, hereinafter "Swing 46").

2. I make this statement in support of my "Response in Opposition" to defendant Eric M. Eisenberg, "defendant Eisenberg's," Notice of Motion, dated April 3, 2025, to dismiss my Amended Complaint.

3. I have been the owner and general manager of Swing 46, located

1

at 349 West 46th Street, New York, New York for over twenty-five years.

4.  Before I operated the club, I emigrated from Bangladesh and became a United States citizen.  I am what is commonly referred as a person of color, along with being a Muslim.  I am what might be referred to as a minority within a minority group.

5.  I am neither ashamed of my national origin, nor my religion. I am proud to be a United States citizen and a resident of New York. I am grateful for the opportunities I have benefited from while living in my community.  I, in turn,  try to provide the community with a art form that includes singing, jazz music with live musicians, and swing dance, what had almost become a dying art form. Over the years I have worked very hard at preserving this form of entertainment.

6.  Swing 46 is located in what is known as "Restaurant Row."  I am very pleased to serve both local customers and tourists with entertainment. The club also provides work for musicians, singers, and dancers,  along with staff that are engaged in duties ranging from janitorial to chefs.

7.  The community in which I work and reside has always been very welcoming to me.  I have never had problems with neither my neighbors nor patrons.  I never suffered from harassment of any kind in all the years I have been in business, but that changed in about 2021.

8. Starting in 2021, continuing through late 2023, I began to notice an individual hanging around outside of my club. He would not come into the club, but just walk back and forth, often staring at club patrons that were dining on the patio. He is a white male, with brown close cropped hair, casually dressed, he often wore a mask, and sometimes a cap. He appeared to be 5'6" to about 5'8". With his demeanor and attire he looked out-of-place, and acted strangely by standing there and staring at patrons and staff. I was to learn his name is Eric M. Eisenberg, the defendant herein.

9. I have been told by the Swing 46 staff that that defendant Eisenberg was coming onto the front patio and place what appeared to be a cell phone directly against a speaker. The patio is private property reserved for patrons and staff. Swing 46 provides live entertainment, and the music is transmitted by speaker for the benefit of patrons dining on the patio. He had been told numerous times to leave but he continued to return and trespass upon the property.

10. A member of the staff, Michelle Collier, has observed defendant Eisenberg coming onto the patio. In one instance she observed defendant Eisenberg lean over a table where a group of young women were having

3

dinner.  When they told him to get away from them, he screamed

something nasty at them before walking off.

11.  After learning from my staff that this individual, that is, defendant

Eisenberg was hanging around and causing problems, I kept a lookout for

him.  I, along with members of my staff,  have had at least ten personal

encounters with defendant Eisenberg trespassing upon my business. He

has been told repeatedly to stay away, but he persisted in returning.  I have

observed him on the patio placing what appears to be a cell phone against

the outdoor patio speakers. After these encounters I was to learn that he

been filing noise complaints against my business.

12.  When I would catch defendant Eisenberg trespassing, I would

immediately direct him to leave. He would become rude and nasty towards

me. I was taken aback by his behavior because I did not know this man,

and the only encounters I had with him was when he come onto, or hang

about, the property.  Other than the defendant Eisenberg, neither myself,

nor my staff, have encountered anyone  else behaving in a similar fashion.

13.  I have never gone to the residence of defendant Eisenberg, but

yet he has persistent in coming to where I reside and maintain my business

to create problems.  Ultimately I came to believe defendant Eisenberg

wants me out of the neighborhood.  I have no other understanding why he

4

would come after me by harassing my patrons and staff, and causing problems for my business.   In addition to his disruptive behavior, there are financial consequences resulting fraudulent noise complaints he has filed against me.  Every day I worry about my business,  and has affect my health and well being.

14. Upon information and belief, defendant Eisenberg gets a share of the fine money that is imposed against me. I have attempted to fight these cases, but to no avail. In my view the system is rigged to benefit the City of New York and the  person writing the noise complaints.  I have been denied access to documents that allow me to defend myself. When I sought adjournments for additional time to prepare a defense, I was told they would be granted, then only to learn that defaults were entered against me.

15.  I am one of very few minority business owners that is a person of color; nor do I know of any other Muslims that operate a restaurant in the area.  None of my neighbors have complained to me over the music, which comes from live performers.  We are providing not only live entertainment, but also preserving a tradition that goes back to the early days of the New York City jazz and swing dance scene. I cannot understand why someone would want to destroy this, and I sincerely believe it is because of my race

and religious beliefs I have been purposely targeted. There is no logical explanation as to why I would be subjected to this amount of harassment and discriminatory behavior.

I, Mohammed John Sohel Akhtar, declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: April 25, 2025

Mohammed "John" Sohel Aktar
Personally and as Owner of of La Buca
Restaurant, Corp. d/b/a Swing 46 Jazz
and Supper Club.

6

Exhibit C

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

Mohamed John Akhtar and
La Buca Restaurant, Inc.  d/b/a
Swing 46 Jazz and Supper Club,

     Plaintiffs,

        v.

Eric Adams, Mayor of  the City of
New York, Rohit T. Aggarwala, New
York City Department of
Environmental Protection,  Eric I.
Eisenberg, and John and Jane
Does One through Thirty,

     Defendants.

Case No.  23-cv-6585  (JGLC)(VF)

## Declaration of  Michelle Collier

I,  Michelle Collier, of full age declare and affirm, under the penalty of perjury, to the truth of the following.

1. I am a resident of the City of New York and I have been an entertainer at La Buca Restaurant, Inc., d/b/a Swing 46 Jazz and Supper Club (hereinafter "Swing 46") for the past ten years.   I am aware of the challenges Swing 46 and its owner, Mohammed Akhtar, (also known as John), are facing.

2.  In addition to entertaining as a singer, I help out at the club with various

1

jobs, such as event planning, promoting, reservations, greeting guests, etc.

3. Swing 46, located on what is famously known as Restaurant Row, provides a unique blend of music, live musicians, and lessons in swing dance. It is a big draw for tourists, which is an asset for the City of New York. Most significantly, it is a source of employment for many of New York City's best performers.

4. The entire community of performers, restaurants, and clubs barely made it through the Covid epidemic; many did not. Now there is another epidemic (financial) caused largely by the fraudulent conduct of an individual known as Eric M. Eisenberg (hereinafter "Eisenberg").

5. There came a time when Swing 46 was hit with a stunning number of noise complaints, enforced by the N.Y.C. Department of Environmental Protection (hereinafter "DEP".) What I came to learn is that DEP has delegated its enforcement responsibilities to private citizens. There is a bounty granted to citizens for summonses issued. This may have encouraged Eisenberg, and perhaps for other reasons, to fabricate claims of excessively loud music he claims he can hear blasted outside of Swing 46.

6. Starting in or around 2022, Eisenberg has been seen prowling the streets around and after dusk, sneaking on to the property of Swing 46. I am aware he has been recorded while trespassing upon Swing 46 property. He has been observed placing what appears to be a cell phone on either the windows of the club or the patio

2

speakers in the ceiling. In spite of what Eisenberg has alleged, never have I heard the sound of music being audible beyond the patio.

7. I have personally encountered Eisenberg when he has come onto the property of Swing 46 where he was told repeatedly not to trespass. Yet, he continued to return where he is not welcome. I have observed him climbing up a pole to recessed speakers in the center awning over the entrance and placing what appeared to be a cell phone directly upon the speaker.

8. Eisenberg also has disturbed patrons dining on Swing 46's patio. He once frightened young girls that were dining with their family, yelling at the host and cursing in a loud, offense manner. He is purposely disrupting business and causing problems for everyone.  His behavior was inexcusable, disturbing and menacing.

9. The challenges that Swing 46 Jazz's owner, Mohammed (John) Akhtar, faces because of Eisenberg's misconduct are enormous, burdensome, unsettling and he should be held accountable. The financial impact is devastating. The club has gotten into serious debt because of the false claims Eisenberg has filed. This is untenable for a small business to deal with.

10. Eisenberg, because of his prowling and hanging around the club, and falsifying an overwhelming number of summonses against this business, gives the appearance that he is specially targeting the business owner, Mohammed (John) Akhtar. I have observed no other individual engage in this activity.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated:    March 20, 2025

Michelle Collier

Exhibit D

# UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF NEW YORK

Mohamed John Sohel Akhtar and
La Buca Restaurant, Inc. d/b/a
Swing 46 Jazz and Supper Club,

    Plaintiffs,

        v.

Eric Adams, Mayor of the City of
New York, Rohit T. Aggarwala, New
York City Department of
Environmental Protection, Eric I.
Eisenberg, and John and Jane
Does One through Thirty,

    Defendants.

Case No. 23-cv-06585 (JGLC)(VF)

## Declaration of Howard Fredrics

I, Howard Fredrics, of full age, declare and affirms, under the penalty of perjury, to the truth of the following:

1. I am a professional audio engineer, sound designer, audio researcher and university professor of music technology with over forty years of experience, which has included calibrating and ensuring safe operation of live sound reinforcement systems for professional theatrical and musical performances, as well as engineering and mastering of commercial recordings for international distribution.

1

2.  I am fully-versed in established standards for measuring sound pressure levels at various distances and under various conditions, using scientific test microphones, decibel meters and related sound measurement software. I am also well-versed in the principles of acoustics as they apply to construction materials and architectural designs of buildings.

3. I hold a BMus degree from Oberlin Conservatory in Technology in Music and Related Arts, and MMus and DMA degrees in Music Composition with Concentration in Computer Music from the University of Texas at Austin. I have also served on the faculties of Brown University, Oberlin Conservatory, Texas A&M University, Western Carolina University and Kingston University of London.

4. have had the benefit of reviewing the Declaration of Michelle Collier, dated March 20, 2025, and am able to offer an expert opinion based upon here sworn statement.  Ms. Collier states, "…never have I heard the sound of music being audible beyond the patio."  She also indicates that "Mr. Eisenberg placed what appeared to be a cell phone 'directly upon the speaker.'" She states the speaker is recessed in the awning above the entrance to the property of Swing 46.

2

5. I have also viewed photographs of the property's entrance, awning and patio area and would estimate the total distance between the recessed speaker and the end of the awning, which extends over the sidewalk, just past the patio, to be approximately 8 feet.

6. If, for example, the SPL was measured at 90dB at 1.2 inches (1/10 ft) from the sound source, a subjectively loud listening level, as might happen were one to place a cell phone running sound measurement software next to a loudspeaker playing music, at 8ft in front of the loudspeaker, on the sidewalk in front of the property, SPL would dissipate to approximately by approximately 38dBA to 52dBA, which, with typical ambient street noise levels in New York City averaging 73dBA, would normally be rendered nearly, if not entirely, inaudible.

7. Indeed, if what might seem like an objectively unreasonably loud SPL of, for example, 90dB for music was more properly measured from a typical passerby's vantage point, the sidewalk location ca. 8ft from the loudspeaker, the SPL level of the music would have dissipated to a negligible SPL level.

8. Because of the number of variables involved in estimating the impact of exterior and interior building surfaces and construction materials on sound dissipation when determining code compliance for a proximate

3

indoor dwelling, it would be advisable to measure sound pressure level (SPL) from within the dwelling in question in order to obtain the most precise measurement results.

9. Moreover, other factors that would impact the validity of measurements taken by Mr. Eisenberg include the quality and frequency response of the cell phone's built-in microphone and the accuracy of the measurement software app used.   Indeed, professional engineers use specialized scientific measurement microphones, and well-calibrated professional SPL meters to take such measurements. Mr. Eisenberg's equipment appear to be consumer-grade equipment, whose reliability cannot be established.

10. Hence, I am of the opinion that Mr. Eisenberg's measurement method of placing a cell phone directly in front of a loudspeaker is inherently inadequate for determining code compliance.

11.  Furthermore, Mr. Eisenberg's having applied his sound measuring device directly to a speaker suggests ignorance of proper collection methods, or alternatively, Mr. Eisenberg had a nefarious intent to distort the results of his measurements for the purpose of making his noise complaints appear genuine, when they are not.

4

I, Howard Fredrics, declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: April 25, 2025

_Howard Fredrics_
Howard Fredrics

5